## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SOUTH RIVER WATERSHED ALLIANCE,
INC. and JACQUELINE ECHOLS,

     Plaintiffs,

v.

DEKALB COUNTY, GEORGIA,

     Defendant.

Civil Action No.
1:19-cv-04299-SDG

## OPINION AND ORDER

This matter is before the Court on Defendant DeKalb County, Georgia's

(DeKalb) motion to dismiss [ECF 30] and motion to strike [ECF 43]. Following a

careful review of the record, and with the benefit of oral argument, DeKalb's

motion to strike is **DENIED** and its motion to dismiss is **GRANTED**.

## I.     BACKGROUND

The Court treats the following facts as true for purposes of this Order.[1]

Plaintiff South River Watershed Alliance, Inc. (South River) is a non-profit

membership organization which advocates to protect and restore the water quality

---

[1]  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999) ("At the motion
to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable
inferences therefrom are construed in the light most favorable to the
plaintiff.").

and biodiversity of the South River and Chattahoochee River watersheds.[2] Plaintiff Jacqueline Echols is a member of South River who uses the watersheds for aesthetic, recreational, ecological, and biological purposes.[3] DeKalb is a political subdivision of the State of Georgia.[4]

DeKalb owns and operates a Water Collection and Transmission System (WCTS) designed to collect and transport wastewater to three locations: (1) DeKalb's Snapfinger Creek water treatment facility; (2) DeKalb's Pole Bridge Creek water treatment facility; and (3) the City of Atlanta's R.M. Clayton water reclamation center.[5] Pursuant to specific effluent limitations set forth in National Pollutant Discharge Elimination System (NPDES) permits issued by the Georgia Environmental Protection Department (EPD), DeKalb is required to collect the wastewater, transport it to these facilities, treat it, then discharge it into the respective surface waters.[6] According to Plaintiffs, DeKalb has repeatedly spilled

---

[2]   ECF 21, ¶ 9.

[3]   *Id*. ¶ 14.

[4]   *Id*. ¶ 15.

[5]   *Id*. ¶ 16.

[6]   *Id*. ¶ 17. The permits are as follows: NPDES Permit No. GA0024147 (Snapfinger Creek); NPDES Permit No. GA0026816 (Pole Bridge Creek); and NPDES Permit No. GA0039012 (R.M. Clayton) [*id*.].

wastewater—including untreated sewage—into surface waters before the wastewater reached the treatment facilities.[7]

On December 13, 2010, the United States and Georgia—on behalf of the United States Environmental Protection Agency (EPA) and EPD, respectively—filed a Complaint against DeKalb for violations of the CWA and Georgia Water Quality Control Act (GWQCA) (hereinafter, the 2010 Complaint).[8] The 2010 Complaint alleged that, since 2006, DeKalb's WCTS experienced hundreds of overflows of untreated wastewater—known as sanitary sewer overflows (SSOs)[9]—that contained pollutants.[10] Many of these overflows resulted in the discharge of sewage into the South River and Chattahoochee watersheds.[11]

On December 21, 2011, United States District Court Judge William S. Duffey approved a Consent Decree executed by DeKalb, the EPA, and the EPD. *United States v. DeKalb Cnty., Ga.*, No. 1:10-CV-4039-WSD, 2011 WL 6402203 (N.D. Ga.

---

[7]    *Id.* ¶ 18.

[8]    *United States v. DeKalb Cnty., Ga.*, No. 1:10-CV-04039-WSD, ECF 1 (Compl.).

[9]    There are two types of SSOs relevant to this action: (1) "spills," which are SSOs that reach the waters of the United States or Georgia; and (2) "Other SSOs," which do not reach those waters but generally occur as backups into homes [ECF 21, ¶¶ 22–23].

[10]    *Id.*

[11]    *Id.*

Dec. 20, 2011).[12] The stated objectives of the Consent Decree are for DeKalb "to use its best efforts to prepare and implement all plans, measures, reports, and construction, maintenance, and operational activities . . . to achieve the goals of: (1) full compliance with the CWA, the GWQCA, and the regulations promulgated thereunder, and (2) the elimination of all SSOs.[13] The Consent Decree required DeKalb to pay a one-time civil penalty in the amount of $453,000 to the United States and Georgia.[14] It also required DeKalb to expend at least $600,000 on a Supplemental Environmental Project benefiting areas impacted by prior discharges.[15]

The Consent Decree additionally contained numerous provisions requiring DeKalb to remediate the WCTS. For example, the Consent Decree required DeKalb to implement a comprehensive program to ensure effective Capacity, Management, Operations, and Maintenance (CMOM), which included a Continuing Sewer Assessment and Rehabilitation Program.[16] The Consent Decree

---

[12]   Both South River and Echols intervened in the 2010 action to oppose entry of the Consent Decree.

[13]   *United States v. DeKalb Cty., Ga.,* No. 1:10-CV-4039-WSD, ECF 39, at 11 (N.D. Ga. Dec. 20, 2011).

[14]   *Id.* at 18.

[15]   ECF 39-7, at 61.

[16]   *Id.* at 19–20.

established timelines for DeKalb to develop and submit certain projects to the EPA or EPD for review and approval, then once approved, for DeKalb to implement the programs.[17] As part of the Continuing Sewer Assessment and Rehabilitation Program, DeKalb identified a list of "priority areas" that required more immediate improvement. These highest priority areas were included in the CMOM program and entitled the Priority Area Sewer Assessment and Rehabilitation Program (PASARP).[18] As of 2018, the PASAPR included approximately 838 miles of sewer line, representing 31% of the sewer line in the WCTS.[19] The Consent Decree mandated that, within 8.5 years from its date of entry (*i.e.*, June 20, 2020), DeKalb identify, delineate, assess, and rehabilitate the WCTS in the priority areas.[20] In contrast, the remaining approximately 69% of sewer lines not included in the priority areas (*i.e.*, non-priority areas) were subject to assessment and rehabilitation under an Ongoing Sewer Assessment and Rehabilitation Program.[21]

---

[17]   *E.g.*, ECF 39-7, at 40–46.

[18]   *Id*. at 63–71.

[19]   *Id*. at 46; ECF 21, ¶ 28.

[20]   ECF 39-7, at 53; ECF 21, ¶ 26.

[21]   ECF 39-7, at 54–56; ECF 21, ¶ 29.

Unlike the priority areas, the Consent Decree contained no timetable or deadline for DeKalb to assess and rehabilitate the non-priority areas.[22]

At the time the Court entered the Consent Decree, DeKalb maintained a flow and rainfall monitoring program that could be used to "assess capacity availability in various sewer segments, and to prioritize sanitary sewers for rehabilitation, repair and/or replacement."[23] The Consent Decree stated that DeKalb "shall use the flow and rainfall monitoring data to develop a dynamic hydraulic model."[24] The Consent Decree defined "model" as a "computer-based dynamic hydraulic model."[25] The Consent Decree required DeKalb to integrate computer-based dynamic hydraulic models for all sewer sheds into one model for the entire WCTS by December 20, 2017.[26]

---

[22]   ECF 21, ¶ 30.

[23]   ECF 39-7, at 37.

[24]   *Id.* According to the Amended Complaint, a "sewer system hydraulic model is a mathematical model of a fluid introduced into a wastewater sewer at various rates and pressures . . . used to provide an understanding of the hydraulic behavior of the system under variable conditions so utilities can make informed decisions concerning planning and capital improvements." [ECF 21, ¶ 34.]

[25]   ECF 39-7, at 38.

[26]   ECF 21, ¶ 37; ECF 39-7, at 39.

The Consent Decree also contained a provision outlining the prospective penalties that could be assessed against DeKalb in the event of noncompliance. For example, for each spill of 10,000 gallons or less, a penalty of $500 may be assessed.[27] If a spill of more than 10,000 gallons occurs, a penalty ranging from $500 to $2,000 may be assessed.[28]

Since the Court's entry of the Consent Decree, Plaintiffs allege DeKalb has violated its terms—as well as the CWA and NPDES permits—in numerous ways. For example, Plaintiffs allege and present evidence that, following entry of the Consent Decree (*i.e.*, 2012–2018), the frequency of sewage spills has met or exceeded the number that occurred prior to the entry of the Consent Decree (*i.e.*, 2005–2011).[29] Plaintiffs allege that, since July 25, 2014, there have been over 800 reported spills of untreated sewage from DeKalb's WCTS into public waterways.[30] Plaintiff also allege that DeKalb intentionally missed the December 20, 2017 deadline in the Consent Decree to integrate computer-based hydraulic models for all its sewer sheds—instead electing to implement a static hydraulic

---

[27]   ECF 39-7, at 69.

[28]   *Id.*

[29]   ECF 21, ¶¶ 61–63.

[30]   *Id.* ¶ 76.

model (also known as a "steady-state" hydraulic mode).[31] The EPA and PED expressly authorized DeKalb to implement the static model.[32]

On July 15, 2019, Plaintiffs mailed DeKalb a notice letter, setting forth their intent to file a citizen suit under the CWA.[33] Plaintiffs subsequently initiated this action on September 24, 2019.[34] Plaintiffs filed their Amended Complaint on February 24, 2020, asserting one count against DeKalb under the CWA and seeking both monetary and injunctive relief.[35] DeKalb filed the instant motion to dismiss on March 9, 2020.[36] On April 14, 2020, Plaintiffs filed their response in opposition to DeKalb's motion to dismiss.[37] DeKalb filed its reply on May 11, 2020.[38] On the same day, DeKalb filed its motion to strike certain evidence relied on by Plaintiffs in their response brief—*i.e.*, a report from Randall Grachek and a declaration from

---

[31]  *Id*. ¶¶ 35, 37–38, 41.

[32]  *Id*. ¶ 42. Plaintiff allege that, in the absence of a dynamic hydraulic model for each watershed, DeKalb cannot rehabilitate the WCTS [*id*. ¶ 49].

[33]  *Id*. ¶¶ 4–5.

[34]  ECF 1.

[35]  ECF 21.

[36]  ECF 30.

[37]  ECF 40.

[38]  ECF 44.

Dustin Mimnaugh.[39] Plaintiffs filed a response in opposition to DeKalb's motion to strike on May 26, 2020.[40] DeKalb filed its reply on June 9, 2020.[41]

## II.   DISCUSSION

### A.   DeKalb's Motion to Strike

DeKalb requests that the Court strike the report of Randall Grachek and the declaration of Dustin Mimnaugh. DeKalb contends this evidence is not based on either individual's personal knowledge, but is instead impermissible speculation dressed up as opinion testimony. DeKalb additionally asserts the evidence is irrelevant to the resolution of the issues in this case. Plaintiffs, conversely, argue the evidence should be considered because they set forth facts within the knowledge of the offering individual.

Motions to strike are governed by Federal Rule of Civil Procedure 12(f). This rule permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are disfavored and viewed as "a drastic remedy to be resorted to only when required for the purposes of justice." *TracFone Wireless, Inc.*

---

[39]   ECF 43.

[40]   ECF 47.

[41]   ECF 49.

*v. Zip Wireless Prod., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010) (citing *Stephens v. Trust for Pub. Land*, 479 F. Supp. 2d 1341, 1346 (N.D. Ga. 2007)). *See also TracFone*, 716 F. Supp. 2d at 1290 ("Motions to strike . . . are often considered time wasters.").

Since Rule 12(f) only contemplates the striking of a pleading, this court routinely finds that a motion to strike "is not the appropriate vehicle for challenging the consideration of evidence." *Green v. ADCO Int'l Plastics Corp.*, No. 1:17-cv-337-WSD-LTW, 2017 WL 8810690, at *5 (N.D. Ga. Dec. 27, 2017), *report and recommendation adopted*, No. 1:17-cv-337-WSD-LTW, 2018 WL 739794 (N.D. Ga. Feb. 7, 2018). Put another way, "[m]otions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike." *Nelson v. Jackson*, No. 1:14-cv-02851-ELR-JFK, 2016 WL 9454420, at *1 (N.D. Ga. May 18, 2016), *report and recommendation adopted as modified*, No. 1:14-cv-02851-ELR, 2016 WL 9455425 (N.D. Ga. June 30, 2016). *See also id.* ("Rather than filing a motion to strike as under Rule 12, the proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony."). Nonetheless, courts in this district generally forgive this procedural error, treating the motion to strike as a notice of objection to the evidence that has been offered. *Id. See also Chavez v. Credit Nation Auto Sales, Inc.*, 966 F. Supp. 2d 1335, 1344 (N.D. Ga. 2013); *Exceptional Mktg. Grp., Inc. v. Jones*, 749 F. Supp. 2d 1352, 1358 (N.D. Ga. 2010). The

Court finds this alternative persuasive for purposes of ruling on DeKalb's motion to dismiss. As such, DeKalb's motion to strike is **DENIED**, but the Court will consider the parties' arguments concerning the probative value of the challenged exhibits.

### B.    DeKalb's Motion to Dismiss

DeKalb argues that Plaintiffs' claims are barred by the EPA's and EPD's diligent prosecution of DeKalb's alleged violations of the CWA and NPDES permits in accordance with the Consent Decree. Plaintiffs, conversely, contend the Consent Decree is insufficient to ensure DeKalb's compliance with the CWA and NPDES permits, and even if it is, the government is not diligently prosecuting DeKalb for its violations.

### i.    Background on the CWA

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987) (citing 33 U.S.C. § 1251(a)). The CWA governs the discharge of pollutants into the navigable waters of the United States. 33 U.S.C. § 1362(7). Section 1311 prohibits the "discharge of any pollutant" from any point source in the absence of a permit authorizing such discharge. § 1311(a). The EPA may issue NPDES permits that allow the permitee to discharge

certain pollutants into waterways when the discharge would otherwise violate the CWA. 33 U.S.C. § 1342. *See also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) ("Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."); *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 989 (11th Cir. 2008) ("The [NPDES] provides that an entity that wishes to discharge pollutants into a particular waterway must obtain a permit from the Administrator of the EPA to do so."). The purpose of a NPDES permit is to transform generally applicable provisions of the CWA into specific obligations on the part of an individual polluter. *Envtl. Prot. Agency v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976).

Section 1365(a) authorizes private citizens to file a civil action against an alleged polluter in violation of "an effluent standard or limitation under this chapter" or "an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a). *See also Legal Envtl. Assistance Found., Inc. v. Pegues*, 904 F.2d 640, 642 (11th Cir. 1990) ("[A] citizen may bring a suit in federal court against an alleged polluter for violation of the Act or a NPDES permit."). A private citizen's ability to file suit "is a critical component of the

CWA's enforcement scheme, as it permits citizens to abate pollution when the government cannot or will not command compliance." *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir. 2008) (citing *Gwaltney*, 484 U.S. at 62).

Private citizens, however, do not possess the unfettered ability to file suit. The CWA contains express limitations. Relevant here, a citizen-suit may not be commenced:

> [I]f the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

§ 1365(b)(1)(B). This subsection is known as the "diligent prosecution" provision.

### *ii.*    **Analysis**

DeKalb's motion rises and falls on whether Plaintiffs' claim is barred by the EPA's and EPD's diligent prosecution of DeKalb's CWA violations. The Court finds Plaintiffs' claim is barred and the Amended Complaint must be dismissed.

### 1.    **The Applicable Motion to Dismiss Standard**

As a threshold matter, there is an open question as to what standard governs DeKalb's motion to dismiss. DeKalb invokes both Rules 12(b)(1) and 12(b)(6). The dichotomy is as follows: If the CWA's diligent prosecution provision is a pre-

requisite to invoke the Court's jurisdiction, then Rule 12(b)(1) controls. On the other hand, if the diligent prosecution provision is not jurisdictional, but rather a necessary element to the cause of action, then Rule 12(b)(6) applies. Neither the Supreme Court nor the Eleventh Circuit has addressed this question, and other federal courts have split in their analysis. *Compare La. Envtl. Action Network v. City of Baton Rouge*, 677 F.3d 737, 749 (5th Cir. 2012) ("[T]he 'diligent prosecution' bar is a nonjurisdictional limitation on citizen suits."), *with Friends of Milwaukee's Rivers & All. for Great Lakes v. Milwaukee Metro. Sewerage Dist.*, 556 F.3d 603, 606 (7th Cir. 2009) (hereafter, *Milwaukee I*) ("The Act strips the courts of subject matter jurisdiction over citizens' suits where the State has timely commenced judicial or administrative enforcement actions."). *See also Ainsworth v. Cmty. Bible Church*, No. 1:10-cv-01964-SCJ, 2012 WL 13076749, at *3 (N.D. Ga. July 19, 2012) (not deciding whether diligent prosecution provision of CWA is jurisdictional because "applying the standard championed by Plaintiffs does not alter the Court's analysis of and conclusion on the merits of the Church's motion").

In *Louisiana Environmental Action Network*, the Fifth Circuit embarked on an extensive analysis of the legislative history underpinning the CWA, relevant Supreme Court precedent dictating whether a provision is a jurisdictional or claim-processing rule, and similar statutory provisions. 677 F.3d at 745–49. The

Fifth Circuit ultimately concluded that "Congress has not provided a clear statement that the diligent prosecution bar is jurisdictional. Absent such a clear statement from Congress, we hold that the diligent prosecution bar is a nonjurisdictional limitation on citizen suits." *Id.* at 749 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502 (2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.")). As such, the Fifth Circuit concluded that Rule 12(b)(6) governs the analysis of the diligent prosecution bar. *Id.* at 746 ("If the provision is not jurisdictional, then [plaintiff] is protected by the safeguards of Federal Rule of Civil Procedure 12(b)(6) — the district court is required to accept all well-pleaded facts in [plaintiff's] complaint as true and view the facts in the light most favorable to [plaintiff]."). District courts in the Eleventh Circuit have since adopted the Fifth Circuit's reasoning. *E.g.*, *Coosa Riverkeeper, Inc. v. Oxford Water Works & Sewer Bd.*, No. 2:16-cv-01737-JEO, 2017 WL 2619087, at *5 (N.D. Ala. June 16, 2017); *Black Warrior Riverkeeper, Inc. v. Se. Cheese Corp.*, No. CV 16-0083-KD-B, 2017 WL 359194, at *5 (S.D. Ala. Jan. 24, 2017).

The Court here finds the Fifth Circuit's detailed analysis persuasive and well-reasoned. Congress did not provide a clear statement in the CWA that the diligent prosecution bar is a jurisdictional requirement. Absent such a statement,

the Court will treat the diligent prosecution provision as non-jurisdictional; as such, DeKalb's motion to dismiss is controlled by the standards applicable to Rule 12(b)(6).

### 2.    Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Am. Dental Ass'n*, 605 F.3d at 1289 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint must also present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). This principle, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

As a general rule, on a motion to dismiss pursuant to Rule 12(b)(6), if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). *See also Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) ("The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint."). The Eleventh Circuit, however, recognizes three exceptions to this rule:

> First, conversion will not occur if the court properly takes judicial notice of attached exhibits. Second, a document attached to the pleadings as an exhibit may be

> considered if it is central to the plaintiff's claim and the
> authenticity of the document is not challenged. Third, the
> conversion is harmless and does not require notice if the
> parties, *inter alia*, made all arguments and submitted all
> the documents they would have even with sufficient
> notice.

*Adamson v. Poorter*, No. 06-15941, 2007 WL 2900576, at *2 (11th Cir. Oct. 4, 2007)

(citations omitted). *See also Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)

("Our Rule 12(b)(6) decisions have adopted the 'incorporation by reference'

doctrine . . . under which a document attached to a motion to dismiss may be

considered by the court without converting the motion into one for summary

judgment only if the attached document is: (1) central to the plaintiff's claim; and

(2) undisputed.").

Here, DeKalb points the Court to evidence outside the four corners of the

Amended Complaint: (1) documents filed in the 2010 litigation;

(2) the 2011 Consent Decree; (3) the NDPES permits; and (4) documents

concerning the EPA's and EPD's enforcement of—and DeKalb's performance

under—the Consent Decree.[42] Plaintiffs relied on many of these documents—such

as the Consent Decree and NPDES permits in the Amended Complaint—to form

their claim. The review of these documents is therefore integral to the proper

---

[42]   *See* ECF 30-2 (table of exhibits attached to DeKalb's motion to dismiss).

consideration and resolution of Plaintiffs' claims and DeKalb's defenses. Moreover, these documents are all public records susceptible to judicial notice. *Universal Express, Inc. v. Sec. & Exch. Comm.*, 177 F. App'x 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that a district court may consider.") (citing *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss."). *See also Henderson v. Sun Pharm. Indus., Ltd.*, 809 F. Supp. 2d 1373, 1379 (N.D. Ga. 2011) ("[T]he Court is permitted to take judicial notice of documents made publicly available by a government entity."). Moreover, no party has raised a challenge as to the authenticity of any of these documents. Therefore, the Court will consider DeKalb's exhibits without converting this motion to dismiss into one for summary judgment.

### 3.   Plaintiffs' Claims Are Barred by the Diligent Prosecution Provision.

DeKalb asserts two arguments regarding the Consent Decree. First, DeKalb contends the 2011 Consent Decree, standing alone, is enough to establish diligent prosecution to bar Plaintiffs' citizen suit. Second, DeKalb argues the EPA's and EPD's ongoing efforts to require compliance with the Consent Decree establish diligent prosecution.

To determine if a citizen suit is barred by the diligent prosecution provision, the Court must undertake a two-part inquiry:

> First, a court must determine whether a prosecution by the state (or the EPA Administrator) to enforce the same 'standard, order, or limitation' was pending on the date that the citizens' suit commenced. Second, if the answer to the previous question is affirmative, a court must also determine whether the prior pending action was being 'diligently prosecuted' by the state [or EPA] at the time that the citizens' suit was filed.

*Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 883 (S.D. W. Va. 2011) (citing 33 U.S.C. § 1365(b)(1)(B); *Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986)). The Court addresses each prong in turn.

### 1.   The 2010 Complaint and 2011 Consent Decree Cover the Same Standard, Order, or Limitation as Plaintiffs' Citizen Suit.

For the first prong, "the CWA's diligent prosecution bar will prohibit citizen suits during the actual litigation as well as after the litigation has been terminated by a . . . consent decree." *Moss v. Sal Lapio, Inc.*, No. CV 19-3210, 2020 WL 3259983, at *5 (E.D. Pa. June 16, 2020) (citing *Godfrey v. Upland Borough*, 209 F. Supp. 3d 804, 809-10 (E.D. Pa. 2016)). The litigation and subsequent consent decree "must seek to enforce the same standard, limitation, or order as the citizen suit." *Appalachian Voices v. Duke Energy Carolinas, LLC*, No. 1:17-cv-1097, 2018 WL 6984857, at *4 (M.D.N.C. Aug. 13, 2018) (citing *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*,

728 F.3d 868, 874 (9th Cir. 2013)). *See also Cox v. Bd. of Cnty. Comm'rs of Franklin Cnty.*, 436 F. Supp. 3d 1070, 1079 (S.D. Ohio 2020) ("[A] diligent prosecution bar only applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit.").

To make this determination, "the court may rely primarily on a comparison of the pleadings filed in the two actions." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 440 (M.D.N.C. 2015). The Court's comparison "need not reveal identical claims for the action to cover the same standards and limitations." *Id.* A citizen suit is barred if it seeks to "enforce specific permit conditions that fall within the scope of a broader agency enforcement action." *Appalachian Voices*, 2018 WL 6984857, at *4 (citing *Cmty. of Cambridge Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 556 (D. Md. 2000)).

Here, a comparison of the 2010 Complaint and Plaintiffs' Amended Complaint, as well as the 2011 Consent Decree, reveals substantial overlap in the standards and limitations on which the government and Plaintiffs base their claims. There is no dispute that both actions concern impermissible sewage discharges from the WCTS into the waterways of DeKalb County in violation of the CWA and NPDES permits. In the 2010 Complaint, the EPA and EPD asserted

two claims against DeKalb for its violations of the CWA and NPDES permits.[43]
The 2010 Complaint sought injunctive relief to require DeKalb's compliance by
rehabilitating portions of the WCTS.[44] The subsequent 2011 Consent Decree levied
civil fines against DeKalb and established a schedule of future civil penalties to
deter future non-compliance.[45] The Consent Decree also contained remediation
provisions.[46]

Plaintiffs' claim here is aimed directly at DeKalb's continued violation of the
same CWA provisions and NDPES permits because of DeKalb's ongoing
discharge of wastewater from the WCTS. As Plaintiffs' counsel conceded at oral
argument, the entirety of Plaintiffs' claims were covered in some fashion by the
2010 Complaint and 2011 Consent Decree. Therefore, the Court finds that the two
actions concern the same "standard, limitation, or order."

---

[43]   *United States v. DeKalb Cnty., Ga.,* No. 1:10-CV-04039-WSD, ECF 1
(Complaint, ¶¶ 39–53).

[44]   *Id.* at 14.

[45]   ECF 39-7, at 18–19.

[46]   *See generally id.* at 19–56.

## 2.    Plaintiffs Have Not Plausibly Alleged a Lack of Diligent Prosecution.

For the second prong of the analysis, the Court must ascertain whether the EPA and EPD are diligently prosecuting the claims raised in their 2010 Complaint and addressed by the 2011 Consent Decree. "A CWA enforcement prosecution will ordinarily be considered 'diligent' if the judicial action is capable of requiring compliance with the Act and is in good faith calculated to do so." *The Piney Run Pres. Ass'n v. The Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008). Diligence is presumed. *Id.* (citing *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004) (hereafter, *Milwaukee II*). And the "burden for proving non-diligence is heavy." *Ohio Valley Envtl. Coal.*, 808 F. Supp. 2d at 883. *See also Piney Run*, 523 F.3d at 459 ("This presumption is due not only to the intended role of the government as the primary enforcer of the CWA, but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems."); *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) ("[O]ur evaluation of the EPA's diligence is quite deferential. Citizen-plaintiffs must meet a high standard to demonstrate that it has failed to prosecute a violation diligently.").

The diligent prosecution bar "does not require government prosecution to be far-reaching or zealous." *Piney Run*, 523 F.3d at 459 (citing *Karr*, 475 F.3d at

1197). To meet their burden, Plaintiffs must do more than "show[ ] that the agency's prosecution strategy is less aggressive than [they] would like or that it did not produce a completely satisfactory result." *Piney Run*, 523 F.3d at 459. *See also Karr*, 475 F.3d at 1197 ("Nor must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff. . . . [C]itizens [are permitted] to act where the EPA has failed to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view."); *N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 558 (1st Cir. 1991) ("[V]iolations may continue despite everything reasonably possible being done by the State and Appellee to correct them."). Plaintiffs must instead show that the government's actions are incapable of requiring compliance with the applicable standards. *Piney Run*, 523 F.3d at 459.

However, the government is not entitled to unlimited deference. The Court cannot merely "accept[ ] at face value [ ] the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement." *Milwaukee II*, 382 F.3d at 760. A citizen suit is proper when "there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding the government-backed consent decree." *City of Dallas*, 529 F.3d at 528–29 (5th Cir. 2008). *See also Yadkin Riverkeeper*,

141 F. Supp. 3d at 441 ("To overcome this presumption, the citizen-plaintiff can demonstrate a pattern of conduct in the state's prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith.").

DeKalb's first contention—that the existence of the 2011 Consent Decree alone is sufficient to establish diligent prosecution—does not pass muster. As the Consent Decree itself expressly states:

> This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. The County is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations and permits; and the County's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the County's compliance with any aspect of this Consent Decree will result in compliance with provision of the CWA, 33 U.S.C. § 1251 *et seq.*, or with any other provisions of federal, state, or local laws, regulations, or permits.[47]

The Consent Decree additionally states that it does not "limit the rights of third parties, not a party to this Consent Decree, against the County."[48] Neither South River nor Echols were parties to the Consent Decree.

---

[47]   ECF 39-7, at 87–88.

[48]   *Id.*

Moreover, to permit a Consent Decree to automatically immunize a polluter from all citizen suits would be to rewrite the CWA and diverge from clearly established law. *E.g., Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. #£1*, 16 F. Supp. 3d 294, 325 (S.D.N.Y. 2014) ("[C]onsent orders between polluters and enforcement agencies do not immunize polluters from citizen suits regarding future violations."). It is the Court's duty to probe the government's prosecutorial vigor and events transpiring post-entry of the Consent Decree. *See Milwaukee II*, 382 F.3d at 760.

DeKalb's second argument—that the EPA's and EPD's ongoing efforts to require compliance with the Consent Decree establish diligent prosecution—is more persuasive. In support of their argument that the Consent Decree has not been diligently prosecuted, Plaintiffs point to the following: (1) repeated sewage discharges from the WCTS in both priority and non-priority areas; (2) DeKalb's failure to meet the June 20, 2020 deadline in the Consent Decree to rehabilitate the WCTS in the priority areas; (3) the Consent Decree's failure to establish a timeline for DeKalb to rehabilitate the WCTS in non-priority areas; (4) the amount of civil penalties levied by the EPA and EPD are too low to force DeKalb's compliance with the CWA and NPDES permits; and (5) DeKalb failed to implement a dynamic hydraulic model to monitor the WCTS—as required by the Consent Decree—but

instead implemented a static hydraulic model with the express permission of the EPA and EPD.

Treated as true, Plaintiffs' well-pleaded factual allegations and reasonable inferences drawn therefrom are troubling. Plaintiffs have identified serious problems with DeKalb's WCTS that have caused the ongoing discharge of raw sewage into public waterways. But the narrow question the Court must answer at this juncture is whether Plaintiffs' allegations, taken as true, overcome the heavy presumption of diligence afforded to the government to state a plausible claim under the CWA's citizen suit provision. The Court finds Plaintiffs have not met this burden.

Plaintiffs point to evidence showing that, since entry of the Consent Decree, discharges from the WCTS into the watersheds have not decreased in either priority or non-priority areas.[49] Hundreds of separate discharges occurred from July 2014 through April 2019, dumping millions of gallons of untreated sewage into the watersheds.[50] However, such an "unsatisfactory result does not necessarily imply lack of diligence." *Karr*, 475 F.3d at 1197 (citing *Scituate*, 949 F.2d at 558 ("[V]iolations may continue despite everything reasonably possible being

---

[49]   ECF 21-2; ECF 21-3; ECF 21-4.

[50]   *Id*.

done by the State . . . to correct them."); *Milwaukee II*, 382 F.3d at 759 ("[D]iligence does not require a state agency to have perfect foresight . . . the statute does not require that the State succeed; it requires only that the State try, diligently.")).

To the contrary, the evidence shows the government has repeatedly levied fines against DeKalb for its noncompliance with the Consent Decree, CWA, and NPDES permits. Between 2012 and 2018, the government assessed penalties against DeKalb in the amount of $650,500 for 1,024 spills and $147,500 for inaccurate reporting.[51] This amount does not include the civil penalties that will be—or have been—levied for DeKalb's 2019 violations.

Plaintiffs argue the dollar amount of the fines is too low. According to Plaintiffs, it is more economically beneficial for DeKalb to continue polluting and pay the fines than fork over the millions—perhaps billions—needed to actually fix the sewer lines. Plaintiffs' desire for DeKalb to be punished more for its continued violations is outside the scope of the Court's role in this case. The law is clear: "[A] citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than [they]

---

[51]   ECF 30-5.

would like or that it did not produce a completely satisfactory result." *Piney Run*, 523 F.3d at 459. *See also Karr*, 475 F.3d at 1197 ("Nor must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff."); *Scituate*, 949 F.2d at 558 ("Merely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief.").

Further, the Court does not possess the institutional expertise of the EPA and EPD regarding sewer lines and wastewater discharges. Thus, "when presented with a consent decree," the Court "must be particularly deferential to the agency's expertise." *Piney Run*, 523 F.3d at 459. *See also Karr*, 475 F.3d at 1197 ("Particularly when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment can undermine agency strategy. If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees."). An agreement on the dollar amount of fines appropriate to deter future violations of the CWA and NPDES permits is precisely the type of discretionary matter to which the Court should defer to the EPA and EPD. *Piney Run*, 523 F.3d at 461 (stating the state agency's "agreement to accept a lower daily fine in the Consent Judgment appears to be nothing more than a concession on the part of [the agency] in

exchange for other obligations . . . that are imposed on the County."). *See also City of Dallas*, 529 F.3d at 531 (citing *Gwaltney*, 484 U.S. at 61) ("The resulting consent decree . . . represents the federal government's discretionary resolution of the level of penalty needed for the same environmental concerns raised by [plaintiff]. . . . That [plaintiff] might have sought stiffer penalties against the City does not change the result; [plaintiff] is not permitted to upset the primary enforcement role of the EPA by seeking civil penalties that the Administrator chose to forego.").

As Plaintiffs point out, the schedule of fines in the Consent Decree is lower than the statutory maximum penalties available under the CWA.[52] To be sure, in some instances a "lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 491 (D.S.C. 1995) ("A penalty serves as a successful deterrent only if potential violators believe that they will be worse off by not complying with the applicable requirements."). But Plaintiffs' argument regarding DeKalb's alleged calculation to continue polluting and pay the lower fines misses the point. The government has continually fined DeKalb for its noncompliance and Plaintiffs have not alleged the bad faith needed to overcome

---

[52]  ECF 40, at 18–20. *Compare* ECF 39-7, at 68–75 (stipulated penalties), *with* 40 C.F.R. § 19.4 (statutory civil penalties).

the heavy presumption of diligence. It is immaterial that the government could have levied harsher penalties. *E.g., City of Dallas*, 529 F.3d at 530–31 ("[I]t is significant that the consent decree imposed $800,000 in civil penalties on the City. This does not represent the maximum penalty permissible under the statute. However, even in the event of a successful citizen suit, the district court is not bound to impose the maximum penalty afforded under the statute. . . . Thus, the penalties imposed by the consent decree are arguably the same penalties that ECO could have achieved in a successful citizen suit.").

Similarly, Plaintiffs argue the futility of the Consent Decree is evidenced by (1) DeKalb's failure to meet the June 20, 2020 deadline to rehabilitate the WCTS in priority areas, and (2) the fact that the Consent Decree did not set forth specific deadlines for DeKalb to rehabilitate the WCTS in non-priority areas. Plaintiffs' first rationale concerning DeKalb's missed June 20 deadline fails for the same reason as their reliance on the continued spills. As a threshold matter, "the fact that an agency has entered into a consent decree with a violator that establishes a prospective schedule of compliance does not necessarily establish lack of diligence." *Piney Run*, 523 F.3d at 459. Just because **DeKalb** missed the June 20, 2020 deadline does not mean the **government** lacked diligent prosecution. Put another way, Plaintiffs cannot transmute DeKalb's breach into factual

allegations of non-diligent prosecution by the government to state a plausible CWA citizen suit.

Plaintiffs' second rationale concerning the non-priority areas is likewise unavailing. The Court notes that the premise of Plaintiffs' argument is undisputed—unlike priority areas, the Consent Decree does not establish a timeline for DeKalb to stop spills, or rehabilitate the WCTS, in non-priority areas. But Plaintiffs' precise argument has been previously rejected. *Piney Run*, 523 F.3d at 461 ("[T]he Association's complaint about the absence of a final compliance deadline in the Consent Judgment is unavailing."). The absence of a strict timeline for DeKalb to remediate the WCTS in non-priority areas seems to be another concession made by the government to reach the totality of the Consent Decree, which the Court must respect. *Karr*, 475 F.3d at 1197 ("[P]articularly when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment can undermine agency strategy. . . . An Administrator unable to make concessions is unable to obtain them."). Moreover, the fact that DeKalb (and to some extent, the EPA and EPD) are not "moving with the alacrity" Plaintiffs would like to fix the WCTS in non-priority areas does not entitle Plaintiffs to pursue a citizen suit in the face of the Consent Decree. *Scituate*, 949 F.2d at 558. *See also Se. Cheese Corp.*, 2017 WL 359194, at *8 (citing *Cherokee Mining,* 637 F. Supp.

2d at 989 ("Riverkeeper cannot overcome the diligent prosecution bar "simply by criticizing the consent order as somehow inadequate, and by asking this court to assume a supervisory role over" the government and alleged polluter)).

Finally, Plaintiffs argue DeKalb's implementation of a static hydraulic mode—rather than a dynamic hydraulic model as required by the Consent Decree—with the EPA's and EPD's permission, demonstrates a lack of diligent prosecution. This raises an issue regarding DeKalb's alleged breach of the Consent Decree, not a freestanding violation of the CWA or the NPDES permits. Nonetheless, while DeKalb is admittedly not complying with the Consent Decree—with the express permission of the government—the implementation of a dynamic or static hydraulic model is precisely the type of decision best left to the discretion of the government agencies possessing the necessary institutional expertise. *See Piney Run*, 523 F.3d at 459; *Karr*, 475 F.3d at 1197. And similarly, Plaintiffs cannot maintain this citizen suit merely because they strongly believe— perhaps rightly—that DeKalb is taking less effective measures than it should to achieve the overall goal. *See Piney Run*, 523 F.3d at 459; *Karr*, 475 F.3d at 1197; *Scituate*, 949 F.2d at 558. *See also Se. Cheese Corp.*, 2017 WL 359194, at *7 ("Riverkeeper cannot overcome the presumption of diligence merely by showing . . . that [the government agency] is not requiring the same modifications that it

desires."); *Roanoke River Basin Ass'n v. Duke Energy Progress, LLC*, No. 1:16-cv-607, 2017 WL 5654757, at *6 (M.D.N.C. Apr. 26, 2017) ("The role of the Court is not to second-guess strategic litigation decisions employed by the agency in prosecuting its enforcement action.").

At bottom, the Court does not take lightly Plaintiffs' allegations and evidence of DeKalb's repeated discharge of sewage into public waterways. Plaintiffs, understandably, want DeKalb to take more aggressive, effective, and immediate actions to ameliorate the WCTS and eliminate these discharges. This is hardly a controversial or indefensible position. But the Court's agreement with Plaintiffs' ultimate goals does not change the regulatory scheme enacted by Congress in the CWA. Plaintiffs' claims substantially cover the same alleged violations for which the EPA and EPD are already prosecuting DeKalb. And Plaintiffs have failed to allege any facts that could plausibly overcome the heavy presumption of diligence afforded to the EPA and EPD. As such, Plaintiffs cannot maintain this citizen suit as a matter of law.

Plaintiffs, however, are not completely without remedy. Based on DeKalb's continued discharges and non-compliance with the Consent Decree, the government and DeKalb have reached an agreement in principle to amend the

Consent Decree.[53] This process will culminate in a public notice-and-comment period and proposed amended Consent Decree, which the Court may approve or reject. Plaintiffs, as intervenors in the 2010 litigation, have the right to have their voices heard before the Court makes such a determination, and the Court invites Plaintiffs to do so. Based on the structure of the CWA, that is the correct forum for Plaintiffs' concerns, not this independent citizen suit.

## III.    CONCLUSION

DeKalb's motion to strike [ECF 43] is **DENIED** and motion to dismiss [ECF 30] is **GRANTED**. The Clerk is **DIRECTED** to close the case.

**SO ORDERED** this the 31st day of August 2020.

Steven D. Grimberg
United States District Court Judge

---

[53]   *United States v. DeKalb Cnty., Ga.,* No. 1:10-CV-4039-SDG, ECF 53 (Status Report).